


**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| JAKE COKER, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 3:20-03071-MGL |
| | § | |
| NORWICH COMMERCIAL GROUP, INC., | § | |
| PHIL DEFRONZO, GERRY GORDON, | § | |
| RUSSELL BABOFF, GREG RADDING, and | § | |
| JIM MORIN, | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
AND GRANTING NORCOM'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Jake Coker (Coker) brought this action against Defendants Norwich Commercial Group, Inc. (Norcom), Phil DeFronzo (DeFronzo), Gerry Gordon (Gordon), Jim Morin (Morin), Russell Baboff (Baboff), and Greg Radding (Radding) (collectively, Defendants).

The Court previously dismissed without prejudice several of Coker's claims, and he failed to amend his complaint. Thus, Coker's remaining causes of action are defamation against Defendants and breach of contract against Norcom. He also alleges he is entitled to punitive damages.

Norcom has asserted counterclaims for breach of contract and breach of contract accompanied by a fraudulent act, and also seeks punitive damages. The Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

Pending before the Court are Defendants' motion for summary judgment, Coker's motion for summary judgment, and Norcom's motion for partial summary judgment. Having carefully considered the motions, the responses, the reply, the record, and the applicable law, it is the judgment of the Court Defendants' motion will be granted, Coker's motion will be denied, and Norcom's motion will be granted.

## II. FACTUAL AND PROCEDURAL HISTORY

Coker worked as a branch manager in South Carolina for Norcom, where he originated mortgages in multiple states. Additionally, Norcom had a joint venture program (the Joint Ventures) with certain real estate companies, which operated as residential mortgage brokerage businesses.

Norcom owned fifty-one percent of the Joint Ventures and the joint partner owned forty-nine percent. The branch manager who recruited the joint partner would receive Norcom's fifty-one percent share, while Norcom would make money on the interest rates for the loans that were sold through the Joint Ventures. Coker recruited three Joint Ventures, in Texas and South Carolina.

The evidence indicates that Fabian Rubal (Rubal) and Nicholas Coplien (Coplien) held themselves out as Norcom employees to contact potential borrowers. Each used an unauthorized Norcom email address and Norcom's logo in their email signatures. Rubal's email signature indicated he was a "Senior Loan Officer[,]" while Coplien's indicated he was a "Loan

Associate[.]" Norcom uses neither title for its employees. Moreover, Rubal's email signature included a Nationwide Mortgage Licensing System and Registry (NMLS) license number that failed to correspond to him.

Rubal and Coplien used these emails to entice business from potential borrowers in California. In one email, for example, Rubal directly contacted a potential borrower—copying Coker—and asked to "go over . . . how we may help you learn your purchase power and help you get into you[r] dream home." December 20, 2018, Email from Rubal at 1.

At times, Coker expressly directed Rubal and Coplien to contact borrowers. In several instances, Coker corresponded with Rubal and Coplien at their unauthorized email addresses. Coker and other members of his branch exchanged emails with materials identifying Rubal as a loan officer. There is evidence Coker paid Rubal over $8,000.

Coker had previously told Norcom that Rubal was a third-party vendor who provided leads for licensed loan originators. Both Rubal and Coplien had been under consideration for potential employment at Norcom. When Norcom learned of Rubal, Coplien, and Coker's conduct, it conducted an investigation. Afterward, it decided to close the South Carolina branch of the company, reasoning the entire branch had been involved in the conduct, whether directly or indirectly. It terminated the branch employees, including Coker.

Gordon, Norcom's General Counsel and Chief Compliance Officer, informed Coker of the branch closure—and thus his termination—in the presence of Sabra Lane (Lane), another employee at the branch. Gordon explained that it appeared Rubal and Coplien had been acting as loan originators, and that everyone at the branch considered them as such.

Coker disputed Gordon's characterizations, but admitted Rubal had been "run[ning] some deals underneath us[.]" Termination Transcript Part 1 at 2. He insisted he had merely been training

Rubal and Coplien, and that he had finished each deal, spoken to each borrower, and failed to pay Rubal and Coplien for their work.

He also implored Gordon refrain from terminating the entire branch "for the actions that [he] had allowed." *Id.* at 5. He hedged he was "not saying that [he was] 100% innocent[.]" Termination Transcript Part 2 at 12.

In an attempt to salvage their relationship, Morin, Norcom's Executive Vice President, Retail Lending, informed the Joint Ventures in South Carolina of Coker's termination. Likewise, Baboff, Norcom's Assistant Vice President, Market Manager, and Radding, Norcom's Senior Vice President for Retail Lending, traveled to Texas to inform the Joint Ventures there.

Norcom reported Coker, Rubal, and Coplien to several state agencies, including the Texas Department of Savings and Mortgage Lending (Texas SML) and California Department of Financial Protection and Innovation (DFPI) for allowing unlicensed loan origination activity.

Ultimately, the Texas SML found Coker had committed no violation of the Texas Finance Code and declined to take disciplinary action against him or his mortgage origination licenses. Coker eventually came to a settlement with the California DFPI, which states Coker declined to admit or deny any of the allegations made against him. The settlement acknowledges that DFPI determined Coker had violated the law. As part of the settlement, Coker agreed to a suspension of his California license, a two-year probation, and a $3,000 fine.

The California Commissioner of Business Oversight issued a Desist and Refrain Order against Rubal, determining Rubal "engaged in business as a mortgage loan originator, without a license from the Commissioner, in violation of Financial Code section 50320." Rubal Desist and Refrain Order.

Coplien, who had obtained a license just before Norcom discovered his conduct, agreed to a settlement with DFPI that included a one-year suspension and a $1,000 fine.

Coker initiated this action against Defendants in the Richland County Court of Common Pleas. He claims that Defendants fabricated the claims of unlicensed loan origination activity to provide justification for his termination, to discourage his business connections from continuing to conduct future mortgage business with him, and to receive the income generated by the Joint Ventures.

Norcom removed the matter to this Court, with the consent of the other Defendants, and Defendants filed a motion to dismiss. The Court granted the motion to dismiss without prejudice and Coker filed an amended complaint. Defendants filed another motion to dismiss, which the Court granted in part. It provided Coker another opportunity to amend his complaint. But, as stated above, he failed to do so. Defendants answered and Norcom asserted its counterclaims.

The parties then filed the instant motions and their responses. Defendants and Norcom filed a reply. The Court, having been fully briefed on the relevant issues, will now adjudicate the motions.

## III. STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party has the burden of proving that summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *Id.* at 323; *see also* Fed. R. Civ. P. 56.

A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Rule 56(c)(1)(A). A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

"[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION AND ANALYSIS

### *A. Whether the Court should grant Defendants' motion for summary judgment as to Coker's defamation claim*

As an initial matter, Defendants argue the Court's previous order dismissed all claims against DeFronzo. Coker posits his amended complaint includes a defamation claim against DeFronzo.

In Coker's amended complaint, he fails to list DeFronzo, Norcom's President and Chief Executive Officer, as liable under his defamation cause of action. *See* Amended Complaint ¶ 41 ("As a result of these defamatory statements, Norcom, Gerry Gordon, Russell Baboff, Greg Radding, and Jim Morin are liable to Plaintiff"); *but see id.* ¶ 40 ("The Plaintiff is also entitled to punitive damages against the Defendants for the malicious, intentional and willful conduct described herein to punish and deter and to make an example. The Plaintiff further asks for the costs of this action to be leveed upon Defendants.").

In his response, Coker maintains "the evidence shows that Phil DeFr[o]nzo ordered the other individual defendants to make the defamatory statements." Coker's Response at 5. But, he failed to state as much in the Amended Complaint. Nevertheless, for the reasons explained more fully below, even if Coker's amended complaint asserted a defamation claim against DeFronzo, it would fail.

Defendants argue South Carolina law applies to Coker's defamation claim as to Gordon and Morin, but Texas law applies to Coker's defamation claim as it applies to Baboff and Radding, because the allegedly defamatory statements were made in those respective places and thus, they posit, the injury occurred there. Coker fails to contest this.

As to the issues discussed in this order, Texas law and South Carolina law are substantially the same. In other words, not only would the outcome be the same under either state's law, but

the Court would also employ the same reasoning. The Court will thus largely discuss the claims together, and need not delve into a choice of law analysis.

Under South Carolina law, a defamation claim requires "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 748 (S.C. Ct. App. 2001); *see also Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017) (substantially the same under Texas law).

Defendants focus on the first and second elements in their motion. They first insist that the statements made by Gordon, Morin, Baboff, and Radding (collectively, Individual Defendants) were true, providing a defense to defamation. Because Individual Defendants made no defamatory statements, they maintain, Coker's claim against Norcom—which rests on the argument it is responsible for defamation by its agents—fails as well. On the other hand, Coker avers the Court should allow a jury to determine whether Individual Defendants' statements were false.

"Truth of the matter or substantial truth is a complete defense to a claim for defamation." *A Fisherman's Best, Inc. v. Recreational Fishing All.*, 310 F.3d 183, 196 (4th Cir. 2002); *see also Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App. 2003) (same under Texas law).

Defendants present evidence Coker knowingly allowed Rubal and Coplien to engage in unlicensed loan origination. Specifically, he permitted them to use unauthorized Norcom email addresses and present themselves as Norcom employees. Despite Rubal being unlicensed as a mortgage loan originator, Coker paid him for leads on potential borrowers in California. Rubal and Coplien directly contacted potential borrowers to discuss loans and terms, sometimes at Coker's express instruction.

At the time of his termination, Coker admitted Rubal had been "run[ning] some deals underneath us[.]" Termination Transcript Part 1 at 2. He implored Norcom, through Gordon, to refrain from closing the entire branch "for the actions that [he] allowed." *Id.* at 5. He admitted that he was "not . . . 100% innocent[,]" Termination Transcript Part 2 at 12, and that he knew Rubal was unlicensed.

Moreover, in text messages with DeFronzo, before his termination, Coker admitted "things got out of hand" and apologized "for the predicament" he had put Norcom in. March 26, 2019, Text Message at 1. In his deposition, he clarified he was referring to "[t]he fact that [Rubal] called himself an LO, created a fake e-mail address and represented himself as something he was not." Coker Deposition at 132–33.

Coker posits that the results of the California and Texas investigations show a genuine dispute of material fact. In the California case, the Commissioner of Business Oversight accused him of knowing about or participating in unlawful and unlicensed mortgage loan origination activity. In a settlement agreement, Coker "neither admit[ted] nor denie[d]" these allegations. Coker DFPI Settlement Agreement ¶ F.

In the Texas case, Texas SML was not "convinced that Mr. Coker ha[d] violated the Texas Finance Code." Texas SML Dismissal at 1. It reserved the right to evaluate the matter further if it received additional evidence. Defendants posit this dismissal was because the conduct had allegedly occurred in California, and thus failed to violate Texas law.

Coker also argued, at the time of his termination, that Rubal and Coplien's actions were part of training in loan origination practices. He posited they were uninvolved in unlicensed loan origination because Coker himself spoke to each borrower and finished the deals. He also claimed Rubal and Coplien were unpaid for their work, which was untrue.

Under California law, where Rubal worked, a mortgage loan originator is a person who "takes a residential mortgage loan application or offers or negotiates terms of a residential mortgage loan" for compensation or gain, or the expectation of compensation or gain. Cal. Fin. Code § 50003.5(a); *see also* 12 U.S.C. § 5102(4) (substantially the same under Federal law). Federal, California, and South Carolina law all require loan originators to be licensed and registered. 12 U.S.C. § 5103(a); Cal. Fin. Code § 50002(a), (d); S.C. Code § 40-58-30(B).

The evidence shows that Rubal and Coplien negotiated loan terms without a license, and thus engaged in unlicensed loan origination. Indeed, the California regulating authority determined as much when it issued the Desist and Refrain Order against Rubal.

Even considering the results of the Texas and California cases, the Court determines there is no issue of material fact that Coker knew this occurred, and encouraged Rubal and Coplien's actions. There is no evidence to support Coker's theory that Defendants fabricated this story to increase their profit from the Joint Ventures.

Having made this determination, the Court will turn to each Individual Defendants' statements to ascertain whether they were substantially true.

***1. Whether Gordon's statements were substantially true***

Gordon terminated Coker in front of Lane, announcing that Norcom had decided to terminate the entire branch. Although a transcript of this meeting exists, Coker has failed to specify exactly which statements he believes were defamatory. The Court focuses on the portions of the transcript that could be inferred as defamatory.

During the meeting, Coker attempted to argue Rubal and Coplien were merely trainees, and failed to act as loan originators. Gordon responded

> [s]o how can you explain the emails that you're sending? You know Bradley, you, uh Phil are sending to the whole group, you know specifically referring to loan

> originators and [Rubal] is on that. You know we have emails where, you know, he and Nick were being instructed to talk to borrowers, talk [rate term,] talk about products.

Termination Transcript Part 1 at 3. Coker retorted that he failed to remember telling the rate term.

Gordon mused,

> unfortunately we have a lot of e-mail that indicates otherwise. And so it shows to us that there's more going on here that just what we thought at first was a, an isolated or discreet issue of, you know, unlicensed, uh, individuals who were not Norcom employees . . . at the time it looked like, you know, you know, maybe just some unlicensed activity.
>
> But since, uh, some further investigation after that it does look like there's something greater going on here that they are being used as loan originators, umm, that there are a lot of communications, um, about transactions and, and, how, how this office is conducting business that, that the corporate office isn't aware of and was purposefully kept out of. Um, that leads us to believe there's a lot of, uh, improper and unauthorized activities going on here that the company just finds unacceptable and something it can't live with and go forward with.

*Id.* at 3–4.

Most of Gordon's statements failed to single out Coker specifically, and instead referred to activity that was occurring at the branch. Moreover, even if he had been referring to Coker specifically, it is undisputed that the activities were "unauthorized" by Norcom. Again, the evidence shows Coker was aware of Coplien and Rubal's conduct.

Gordon's statements were thus substantially true.

#### ***2. Whether Morin's statements were substantially true***

As to Morin, Coker alleges he made defamatory statements in two instances. First, he contends he made statements to Jessica Brand (Brand), one of Norcom's partners in a Joint Venture. But, there is no evidence Morin met with Brand to discuss Coker's termination. Coker's defamation claim against Morin fails on this ground.

Second, Coker alleges Morin told Christopher Kauffman (Kauffman), one of the Joint Venture partners in South Carolina, that Coker "had been terminated from Norcom due to fraudulent mortgage origination activity" and that regulatory "authorities had already revoked [Coker's] licenses in multiple states[,] including Texas and South Carolina." Amended Complaint ¶ 34.

Defendants present evidence that shows Morin failed to say anything to Kauffman about Coker's license. At Morin's deposition, he stated he "do[es] not believe" he told Kauffman that Coker's licenses had been suspended. Morin Deposition at 16. Coker neglects to present any evidence to the contrary. Thus, although the alleged statements about Coker's license would have been false, there is no evidence Morin made such statements.

Instead, the evidence shows Kauffman understood Norcom had terminated Coker "because he had done something wrong." Kauffman Deposition at 21. Morin told Kauffman that Coker had been "involved in unlicensed activity." Morin Deposition at 15. For the reasons explained above, this is substantially true. Although Coker himself was licensed, he was involved in Coplien and Rubal's unlicensed activity.

***3. Whether Baboff's and Radding's statements were substantially true***

There is evidence that at a meeting with Drew Colon (Colon), a Joint Venture partner in Texas, Baboff and/or Radding told Colon Norcom had terminated Coker "because of fraud" and Coker was "in jeopardy of losing his license because of some actions that he took." Colon Deposition at 44–45. They also told Jessica Hargis (Hargis), a different Joint Venture partner in Texas, that Coker had been fired for his involvement in unlicensed loan-origination activity.

Under Texas law, a statement is substantially true "[i]f the underlying facts as to the gist of the defamatory charge are undisputed[.]" *Austin*, 118 S.W.3d at 496; *see also Anderson v.*

*Stanco Sports Lib, Inc.*, 542 F.2d 638, 641 (4th Cir. 1976) (applying same principle under South Carolina law). "The test used in deciding whether a statement is substantially true involves considering whether the alleged defamatory statement was more damaging to the plaintiff's reputation, in the mind of the average listener, than a truthful statement would have been." *Id.*

Rubal and Coplien misrepresented themselves as Norcom employees and as people authorized to originate loans. Rubal even used a fake NMLS license number in his email signature. They took these actions to induce potential borrowers in California to conduct business.

Coker was fired because he knew about and facilitated this activity. Thus, any statements Norcom fired him "because of fraud" were substantially true. *See Conroy v. Regents of Univ. of Cal.*, 203 P.3d 1127, 1255 (Cal. 2009) ("The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage."). The statements, at the very least, reflected the "gist" of what had occurred. *Austin*, 118 S.W.3d at 496.

Likewise, Coker's license was in jeopardy. Norcom had reported the activity to state agencies. Indeed, Coker eventually agreed to a suspension of his license in California. This statement was thus also substantially true.

Finally, for the reasons explained above, statements made to Hargis that Coker had been involved in unlicensed loan-origination activity were substantially true.

Because the Court determines that each of the Individual Defendants' statements were substantially true, it need not consider the other elements of defamation and will grant summary judgment in the Individual Defendants' favor on that claim. *See Karsten v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc.*, 36 F.3d 8, 11 (4th Cir. 1994) ("If the first reason given is

independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest dicta.").

Moreover, because the Court will grant summary judgment in favor of all the Individual Defendants, it must also grant summary judgment as to Norcom on the defamation cause of action. As stated above, Coker's defamation claim against Norcom arises out of the Individual Defendants' alleged defamatory statements. The Court will also grant summary judgment as to any defamation claim against DeFronzo for the same reason.

### *B. Whether the Court should grant Defendants' motion for summary judgment as to Coker's breach of contract claim*

Coker's breach of contract claim arises out of his complaint that Norcom failed to pay him certain commissions he believes he is owed.

Defendants contend the contract failed to entitle Coker to the commissions he seeks. Even if it did, however, they insist the Court should grant summary judgment on Coker's breach of contract claim because Coker violated a material provision of his agreement, which excuses their nonperformance on the contract. Coker maintains he failed to violate the law, and he is owed compensation under his contract.

Under South Carolina law, "[t]he elements for a breach of contract are the existence of the contract, its breach, and the damages caused by such breach." *S. Glass & Plastics Co., Inc. v. Kemper*, 732 S.E.2d 205, 209 (S.C. Ct. App. 2012).

Further, "[i]t is an elementary principle that one who seeks to recover damages for the breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was at the appropriate time able, ready and willing so to perform it." *Parks v. Lyons*, 64 S.E.2d 123, 126 (S.C. 1951). Relatedly, "[a] breach of contract claim warranting rescission of the contract must be so substantial and fundamental as to defeat the

purpose of the contract." *Brazell v. Windsor*, 682 S.E.2d 824, 826 (S.C. 2009). "Thus, a rescission will not be granted for a minor or casual breach of a contract[.]" *Id.*

In the contract, Coker agreed to comply with the laws and regulations governing his own mortgage-loan activity and the mortgage-loan activity of his branch. He also agreed to comply with Norcom's policies and procedures. The parties agree these promises were a binding and material part of a contract that existed between Coker and Norcom.

Under California law, a mortgage loan originator licensee must "demonstrate[ ] financial responsibility, character, and general fitness as to command the confidence of the community and to warrant a determination that the mortgage loan originator will operate honestly, fairly, and efficiently[.]" Cal. Fin. Code § 50141(a)(3) (setting forth the licensing requirements); *see also id.* § 50144 (explaining an originator must continue to meet the standards of Section 50141 every year).

As described above, there is no genuine issue of material fact that Coplien and Rubal engaged in unlicensed loan origination, and that Coker knew about and encouraged the conduct. Coker's dishonest conduct violated the California Financial Code licensing requirements, and thus Coker failed to perform on his contract with Norcom. This is more than a minor or casual breach; it defeats the purpose of the parties in establishing the contract. Accordingly, Coker is unable to recover for breach of contract.

Therefore, the Court will grant summary judgment as to Coker's breach of contract claim. It thus need not consider whether the contract contemplates payment of the commissions. *See Karsten*, 36 F.3d at 11 ("If the first reason given is independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest dicta.").

### *C. Whether the Court should grant Coker's motion for summary judgment as to Norcom's counterclaims*

#### *1. Whether the Court should dismiss Norcom's counterclaims because it has failed to show damages*

Coker next contends the Court should dismiss Norcom's counterclaims because it has failed to show damages. On the other hand, Norcom maintains it has presented a genuine issue of material fact as to actual damages arising from the closure of its South Carolina branch.

"Damages recoverable for breach of contract either must flow as a natural consequence of the breach or must have been reasonably within the parties' contemplation at the time of the contract." *Manning v. City of Columbia*, 377 S.E.2d 335, 337 (S.C. 1989). "Lost profits are well recognized as a species of consequential damages." *John D. Hollingsworth on Wheels, Inc. v. Arkon Corp.*, 305 S.E.2d 71, 73 (S.C. 1983).

An injured party is required to do what an ordinary, prudent person would do under similar circumstances to mitigate his damages. *Du Bose v. Bultman*, 56 S.E.2d 95, 96 (S.C. 1949). Generally, "[t]he amount of damages is a question for the jury." *Perry v. Green*, 437 S.E.2d 150, 153 (S.C. Ct. App. 1993).

Coker contends the branch closure was neither contemplated by the parties when entering the contract nor a natural cost of his termination. He maintains "[c]ommon sense tells you that stores don't simply close every[ ]time a manager leaves – they hire a new manager and keep the store open. A decision to close a branch is always the business owner's decision, not a natural consequence of an employee leaving." Coker's Motion at 2. Norcom counters that the closure of the branch was a natural consequence of Coker's actions, and that any overly drastic reaction by Norcom goes to failure to mitigate damages, rather than the existence of damages itself.

To bolster his argument, Coker repeatedly refers to an employee "leaving" a company. Coker's Motion at 2. Although a branch closure may be an unnatural cost of an employee "leaving" a company, Norcom's allegations are different than that. Norcom contends the branch closure was necessitated by Coker's breach of the contract, *i.e.*, his allowing and facilitating the unlicensed loan origination by Rubal and Coplien. Norcom posits Coker infected the entire branch by dishonestly holding Rubal and Coplien out as loan officers.

Norcom has presented evidence that Norcom reasonably feared liability arising from Coker's actions if it failed to act to separate itself from nefarious activity. Its decision to close the branch, therefore, arose naturally from Coker's breach of his contract—rather than from his termination.

Moreover, Coker contends the branch's lack of profitability means that its closure saved Norcom money. But, Norcom explains that although the branch was unprofitable in originating loans, Norcom profited at the corporate level through collection of interest and sale of loans closed by the branch. Because Norcom presents evidence as to lost corporate profit, Coker's argument fails.

Norcom has presented a genuine issue of material fact as to the existence of actual damages. The Court determines the issue of whether Norcom could have mitigated its damages by taking actions less extreme than closing the branch entirely is a question for a jury. Accordingly, the Court will refrain from granting summary judgment on this ground. It need not address the parties' other arguments. *See Karsten*, 36 F.3d at 11 ("If the first reason given is independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest dicta.").

**_2. Whether the Court should dismiss Norcom's breach of contract accompanied by a fraudulent act claim because of a lack of evidence of intent to defraud_**

Coker also argues Norcom has failed to show Coker intended to defraud Norcom. Norcom insists the Court should allow the parties to present the question of fraudulent intent to the jury. Although Norcom infers Coker intended this argument to go to the issue of punitive damages only, the Court determines Coker asks the Court to grant summary judgment as to Norcom's breach of contract accompanied by a fraudulent act cause of action.

Under South Carolina law, a plaintiff alleging breach of contract accompanied by a fraudulent act must show "(1) a breach of contract; (2) fraudulent intent relating to the breach of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *Conner v. City of Forest Acres*, 560 S.E.2d 606, 612 (S.C. 2002).

"Fraudulent intent is normally proved by circumstances surrounding the breach." *Floyd v. Country Squire Mobile Homes, Inc.*, 336 S.E.2d 502, 503–04 (S.C. Ct. App. 1985). Because this is a highly fact-intensive inquiry specific to the case at hand, the Fourth Circuit has noted "most cases" affirm the submission of this question to the jury. *Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 201 (4th Cir. 1988).

Although "motive . . . can be used to show fraudulent intent[,]" *Parker v. Nat'l Honorary Beta Club*, 815 S.E.2d 769, 771 (S.C. Ct. App. 2018), a plaintiff need not show that the defendant intended to harm them with its fraudulent act. Instead, "[e]vidence of a dishonest design or devious scheme satisfies the fraudulent intent element." *Id.*

As the Court explained already, there is evidence that Coker's facilitation of Rubal and Coplien's actions involved a dishonest design meant to mislead potential borrowers. A reasonable jury could thus find that Coker acted with the requisite fraudulent intent. The Court will thus

refrain from granting summary judgment as to Norcom's breach of contract accompanied by a fraudulent act claim on this ground.

### *3. Whether the Court should dismiss Norcom's prayer for punitive damages*

Finally, Coker also argues the Court should grant summary judgment as to Norcom's prayer for punitive damages as to its breach of contract accompanied by a fraudulent act claim because of the lack of actual damages. Norcom maintains, as above, that it has established a genuine issue of material fact as to actual damages.

"The rule in South Carolina is that there must be an award of actual or nominal damages for a verdict of punitive damages to be supported." *McGee v. Bruce Hosp. System*, 545 S.E.2d 286, 288 (S.C. 2001).

As stated above, a jury could find Norcom suffered actual damages in this case. A jury thus may validly award punitive damages as well. Accordingly, the Court will refrain from granting summary judgment as to Norcom's prayer for punitive damages.

### *D. Whether the Court should grant Norcom's motion for summary judgment as to the issues of contract and breach*

Norcom avers the Court should grant partial summary judgment on Norcom's counterclaims as to the issues of contract and breach. Coker posits Norcom has neglected to establish breach because Coker failed to violate the law pertaining to loan origination.

Under Rule 56(a), the Court may grant summary judgment as to part of a party's claim or claims. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.").

Both Norcom's counterclaims include as elements the existence of a contract and breach. As described above, Norcom has established both those elements.

The Court will thus grant summary judgment as to the issues of contract and breach for the purposes of Norcom's counterclaims.

## V. CONCLUSION

For the reasons stated above, it is the judgment of the Court Defendants' motion for summary judgment is **GRANTED**, Coker's motion for summary judgment is **DENIED,** and Norcom's motion for partial summary judgment is **GRANTED**. Thus, all that remains are Norcom's counterclaims.

**IT IS SO ORDERED.**

Signed this 2nd day of June 2023, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE